UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| GREG HRASOK, Individually and on behalf of all others similarly situated, | Case No: 4:18-cv-591-KMH |
| Plaintiff, | **AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |
| v. | |
| | **JURY TRIAL DEMANDED** |
| KRATON CORPORATION, KEVIN M. FOGARTY, and STEPHEN E. TREMBLAY, | |
| Defendants. | |

Plaintiff Greg Hrasok ("Plaintiff"), by Plaintiff's undersigned attorneys, individually and on behalf of all other persons similarly situated, alleges the following based upon personal knowledge as to Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Kraton Corporation ("Kraton" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action against Kraton Corporation, its CEO Kevin Fogarty, and its CFO Stephen Tremblay brought on behalf of a class consisting of all persons and entities, other than Defendants and their affiliates, who purchased or otherwise acquired publicly traded securities of Kraton between October 25, 2017 and February 21, 2018, inclusive (the "Class

Period"), seeking to recover compensable damages caused by Defendants' violations of federal securities laws (the "Class").

2.     Kraton manufactures and sells polymers and chemicals around the world. Kraton's leading brand is Cariflex, a line of synthetic rubber alternatives that Kraton launched in 2007. Cariflex is primarily used in surgical gloves and condoms, which require extremely high purity. Cariflex is a significant and growing portion of Kraton's business. Cariflex sales accounted for 16.7% of Kraton's revenues in 2016, up from just 9.0% of Kraton's revenues in 2011. As of 2015, Cariflex accounted for 11% of the world-wide surgical glove market and 50% of the synthetic surgical glove market.

3.     At its Investor Day presentation in June 2015, Kraton announced a "cost reset" initiative that promised to save $70 million in annual costs by 2018. One aspect of the cost reset required a complete overhaul of the manufacturing process for Cariflex. Instead of polymerizing the Cariflex in its Belpre, Ohio plant and shipping it to Paulinia, Brazil for emulsification and finishing, Kraton would implement a new proprietary processing technology to simplify the supply chain by moving the entire manufacturing process to its Paulinia facility. Kraton called this new manufacturing process "Direct Connect." Kraton told investors that the Direct Connect process would be fully implemented by the third quarter of 2017.

4.     Throughout 2016 and the first half of 2017, Kraton repeatedly assured investors that the Direct Connect implementation was on track to be completed by the third quarter of 2017. At the Company's investor call for the second quarter of 2017, Fogarty told investors that the Direct Connect process was "nearly complete" in July 2017. Investors were especially focused on Cariflex because its continued growth was central to the Company's business plan. As one analyst

put it, "Their whole business plan is to really focus on expanding share with Cariflex and HSBC while still maintaining share in USBC."

5.      As Kraton announced its earnings for the third quarter of 2017, analysts anxiously awaited confirmation that the Direct Connect implementation had been completed. Fogarty assured investors that "we completed our Cariflex conversion in Paulinia, Brazil." In response to an analyst seeking further confirmation, Tremblay reiterated that Direct Connect had been completed and that the Company was "currently in the process of continuing to transition customers to that new capability." In response to a follow-up request for more details, Fogarty claimed that the Direct Connect process had already produced "commercial product that's available for customers." Fogarty assured investors that "at a minimum [Cariflex] should still continue to have multiple of GDP growth."

6.      Unbeknownst to Kraton's shareholders, Kraton had not in fact "cracked the code with Cariflex." The new Direct Connect manufacturing process had produced a flawed product that many of the Company's customers were unable to use in their manufacturing process. Some of the customers had even sent the Cariflex back to Kraton's Brazilian plant so that Kraton could examine the material to determine the problem.

7.      Just days after falsely assuring investors that the Direct Connect process was complete and had produced commercially viable Cariflex, the Individual Defendants sold nearly $6.4 million of their personally-held Kraton stock at artificially inflated prices.

| Defendant | Date Sold | Shares Sold | Proceeds |
|---|---|---|---|
| Tremblay | 10/30/17 | 12,619 | $603,441 |
| Tremblay | 10/30/17 | 12,193 | $583,069 |
| Tremblay | 10/31/17 | 24,811 | $1,196,635 |
| Fogarty | 11/01/17 | 81,430 | $3,997,399 |
| **TOTAL** | | **131,053** | **$6,380,543** |

8.      None of the Individual Defendants' stock sales were executed pursuant to a Rule 10b5-1 plan. Tremblay had never sold any of his Kraton stock prior to October 30, 2017, and he has not sold any Kraton stock since October 31, 2017. Fogarty had not sold any Kraton stock outside of a Rule 10b5-1 plan since 2012, and he has not sold any Kraton stock outside of a Rule 10b5-1 plan since.

9.      One month later, at the Citi Basic Materials Conference, Defendants again reassured investors that Direct Connect was a success. Tremblay bragged to investors that Kraton had "crack[ed] the code with Cariflex," which he called a "big deal." He also told investors that the "construction of that activity is completed, and we're going through the qualification stage with the customers."

10.     Unsatisfied with his nearly $4 million haul on November 1, but wary of attracting attention with another large sale of stock, Fogarty adopted a new Rule 10b5-1 plan on November 16, 2017 in a misguided attempt to cover up his insider trading. Following the Citi conference, Fogarty sold over $4.4 million more of his Kraton stock through his new Rule 10b5-1 plan in December 2017 and January 2018.

| Defendant | Date Sold | Shares Sold | Proceeds |
|---|---|---|---|
| Fogarty | 12/18/17 | 1,042 | $52,100 |
| Fogarty | 01/02/18 | 87,768 | $4,388,400 |
| **TOTAL** | | **88,810** | **$4,440,500** |

11.     The truth of Direct Connect's failure was finally revealed on February 21, 2018 when Kraton released its 2017 fourth quarter and full year earnings. The Company's Form 10-K admitted that "some customers notified us that they were experiencing processing issues with the material . . . and in certain cases the material was returned to us for evaluation." The Direct Connect problems resulted in a $7.6 million negative impact on the Company's fourth quarter 2017

4

Adjusted EBITDA. The $7.6 million impact represented 9% of Kraton's adjusted EBITDA for the fourth quarter, including 15% of the adjusted EBITDA for the Company's polymer segment.

12.     Fogarty conceded on the fourth quarter 2017 investor call that Defendants were "not entirely surprised that there are some issues associated with that type of new material that the customers experienced." Notably, Defendants had led investors to believe the Cariflex manufacturing process was producing high quality product, while these known problems were hidden from investors.

13.     In reaction to Defendants' announcement, the price of Kraton stock fell $7.69 per share – over 15% – to close at $43.10 per share on February 21, 2018

## JURISDICTION AND VENUE

14.     The claims asserted herein arise under and pursuant to Sections 10(b), 20(a), and 20A of the Exchange Act (15 U.S.C. § 78j(b), 78t(a), 78t-1) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

15.     This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

16.     Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b), as Defendants conduct business and the Company is headquartered in this District.

17.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

18.     Plaintiff, as set forth in the previously filed Certification incorporated herein by reference, acquired Kraton securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

19.     Defendant Kraton produces and sells styrenic block copolymers and other engineered polymers in the Americas, Europe, the Middle East, Africa, and the Asia Pacific. Kraton is a Delaware corporation which produces Cariflex, a polyisoprene product, in its Paulinia, Brazil manufacturing facility. Kraton's principal executive offices are located at 15710 John F. Kennedy Blvd, Suite 300, Houston, TX 77032. Kraton securities trade on the NYSE under the ticker symbol "KRA."

20.     Defendant Kevin M. Fogarty ("Fogarty") has been the Company's Chief Executive Officer ("CEO") and President since January 2008 and a Director of the Company since September 2009. He previously served as Executive Vice President of Global Sales and Marketing at Kraton. Fogarty serves on the Board's Executive Committee. As described in Kraton's proxy materials, Fogarty has extensive sales, marketing and high-level leadership experience in the chemical industry, including experience in the specialty chemicals business, sets the strategic direction of the Company, and provides valuable insight to the Board into the day to day business issues facing the Company.

21.     Defendant Stephen E. Tremblay ("Tremblay") has been the Company's Chief Financial Officer ("CFO") since January 21, 2008 and serves as its Executive Vice President. Tremblay has extensive experience in the polymer industry, having previously held senior finance positions at Wellman, Inc., a provider of polyester fiber and resins, from 1990 to 1997

22.     Defendants Fogarty and Tremblay are sometimes referred to herein as the "Individual Defendants."

23.     Each of the Individual Defendants:

    a.   directly participated in the management of the Company;

    b.   was directly involved in the day-to-day operations of the Company at the highest levels;

    c.   was privy to confidential proprietary information concerning the Company and its business and operations;

    d.   was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

    e.   was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

    f.   was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

    g.   approved or ratified these statements in violation of the federal securities laws.

24.     Kraton is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

25.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Kraton under *respondeat superior* and agency principles.

26.     Defendant Kraton and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## DEFENDANTS COMMITTED SECURITIES FRAUD

### Background

27.     Kraton originated as part of the chemical division of the Shell Oil Company before being sold to a private equity firm in 2001 and completing its initial public offering in 2009. Kraton's primary business is the manufacture and sale of engineered polymers, which it categorizes into three groups: performance products, specialty polymers, and Cariflex. Kraton produces Cariflex as a synthetic rubber and a synthetic rubber latex, both of which are marketed as substitutes for natural rubber products.

28.     Kraton is the world's leading manufacturer of polyisoprene rubber latex, with Cariflex controlling half of the world's market for surgical gloves. The vast majority of Cariflex's current market is for the rubber latex in the medical industry, primarily for the manufacture of surgical gloves and condoms. Kraton has repeatedly told investors that it believes the market for Cariflex will expand far beyond the medical industry.

29.     Kraton's business model is especially focused on Cariflex because – unlike most of Kraton's other products – it is a high-margin product that has no competition from larger polymer producers. An analyst from SunTrust Robinson Humphrey stated in January 2018 that Kraton has focused on markets with higher pricing, such as surgical gloves and condoms, and has reduced its reliance on commodity products, such as those used in asphalt and footwear, where it competes with larger companies such as Sinopec. The analyst also noted that Kraton's specialty HSBC business has been growing revenue at about 5% while the Cariflex business has been growing at

10% to 15%. "Their whole business plan is to really focus on expanding share with Cariflex and HSBC while still maintaining share in USBC," the analyst told Investors Business Daily.

### Kraton Looks to Cut Costs with "Direct Connect"

30.     At its 2015 Investor Day in June 2015, Kraton announced a 4-point cost reduction plan to "aggressively improve our cost position through multiple initiatives" to improve the Company's competitiveness. The cost reduction plan promised $70M in annual run rate cost savings and $50M of working capital reduction.

31.     One aspect of the cost reduction plan was a new proprietary manufacturing process for Cariflex to simplify the supply chain ("Direct Connect"). At the time, Kraton manufactured Cariflex in a two-step process across two continents. The synthetic rubber was polymerized at Kraton's plant in Belpre, Ohio and then shipped to Paulinia, Brazil for emulsification and finishing. The new manufacturing process would take place entirely at Kraton's manufacturing plant in Paulinia, Brazil.



32.     Kraton told investors that the Direct Connect project would be completed in 2017. Over the next two years, Defendants gave regular updates to investors and analysts on this important project. These updates repeatedly affirmed to investors that the Direct Connect project was being successfully implemented. In April 2016, in its first quarter 2016 earnings presentation, Kraton told investors that the "Cariflex 'direct connect' design underway with expected mechanical completion by Q4'17." A year later in April 2017, in its first quarter 2017 earnings presentation, Kraton moved up its expected completion date to the third quarter of 2017: "Cariflex 'direct-connect' conversion in Paulinia underway, expect Q3'17 completion."

### Defendants Misleadingly Tout the Successful Completion of Direct Connect

33.     At the end of the third quarter of 2017, analysts and investors were anxiously awaiting confirmation that the Direct Connect project was completed on schedule.

34.     On Kraton's third quarter 2017 earnings call on October 25, 2017, Defendants assured the market that the Direct Connect conversion had been successfully completed and was already producing "commercial product that's available for customer."

35.     Fogarty bluntly confirmed in his opening remarks that "***we completed our Cariflex conversion in Paulinia***." In the Q&A portion of the call, an analyst from SunTrust Robinson Humphrey asked Defendants to "elaborate on where you stand on the different pieces of your cost savings program, including when you completed or expect to complete the construction of each of your global projects." Tremblay responded by implying that Kraton had already begun shipping its new Cariflex product to customers, stating that the Company was "currently in the process of ***continuing to transition customers to that new capability***."

36.     The SunTrust analyst followed up asking for clarification about what the Company meant when it announced that the Direct Connect conversion in Paulinia had been completed: "It

sounds like Paulinia and the JV in Taiwan is complete. But you're kind of in the early stages of that, is that correct?" Fogarty shot down the suggestion that the Direct Connect conversion was in the "early stage." While conceding that volumes of the new Cariflex were still low, Fogarty assured the analyst that the "***Cariflex opportunity in Paulinia is much further along than the early stages*** where ***we've got commercial product that's available for customers***."

37.     On November 28, 2017, at the Citi Basic Materials Conference, Defendants again misleadingly touted the successful completion of the Direct Connect conversion. Tremblay bragged to analysts that Kraton had "crack[ed] the code with Cariflex" by figuring out how to successfully manufacture the product entirely in Paulinia and again confirmed that commercial-ready product had already been shipped to customers.

38.     In his opening remarks, Tremblay emphasized the importance of Cariflex to Kraton's business model. Tremblay stated that Cariflex was Kraton's "***highest margin***" product and that "[t]here's nobody in the space that makes Cariflex high-end surgical gloves and condoms. Nobody makes that material in our industry."

39.     An analyst from Citi asked Tremblay for an update on the Direct Connect conversion in Paulinia and the Company's other cost reduction measures. Tremblay began his response by touting the great work Kraton had done to successfully complete the Direct Connect conversion: "[W]e've executed on that well. The team did a really good job." Tremblay provided some background on the Direct Connect conversion by describing the Company's original two-step process for manufacturing Cariflex: "When we invented that material, we made rubber out of Isoprene, literally made a solid block of rubber in Ohio, and moved it to our facility in Brazil, and then converted it to a latex. . . . We literally take perfectly good isoprene, and convert it to a solid and then turn it into a liquid again." Tremblay then bragged that Kraton had "solved" the two-step

conversion problem by creating a new proprietary single-step process, and that solution was the "genesis of this conversion in our Brazil facility where **_we eliminated_** the step of making the precursor rubber in Ohio and shipping it to Brazil."

40.     After providing the background of the Direct Connect conversion, Tremblay flatly asserted that Kraton had been shipping "finished product" to its customers in Asia: "**_[N]ow we're able to make the latex from start to finish in Brazil and then ship the finished product directly to the customer_**." Tremblay again confirmed that the newly processed Cariflex had already been received by customers: "That construction of that activity is **_completed_**, and **_we're going through the qualification stage with the customers_**."

41.     The Citi analyst then asked which of the cost reduction measures Kraton believed had the most upside. Tremblay responded that the Direct Connect project was the most important to the Company because of the successful creation of a proprietary manufacturing process for the Company's primary growth business. In his response, Tremblay again reiterated the "**_fact that we now have a new way to make latex_** to service that glove market." Further, Tremblay touted that "**_cracking the code in Cariflex is a big deal_**." Tremblay then contrasted the already-successful Direct Connect project to the Company's new facility in France, "given we just completed it, and we haven't sold any product material product [sic] to customers yet." This contrast again reassured the market that Kraton was already successfully selling the newly processed Cariflex to its customers.

## The Individual Defendants Sell Off Their Kraton Stock

42.     Beginning on October 30, 2017 – just five days after the Company touted its successful completion of the Direct Connect conversion – the Individual Defendants began exercising their options to acquire Kraton shares and selling off their shares of Kraton stock at

artificially-inflated prices while in possession of material non-public information. From October 30, 2017 through January 2, 2018, the Individual Defendants exercised 219,863 options to acquire Kraton stock and then immediately sold all 219,863 shares on the open market for over $10.8 million in total proceeds and over $7.7 million in total profit. These exercises and sales were suspicious and highly unusual in both their timing and volume. Neither of the Individual Defendants had exercised any Kraton options since 2011, and neither had sold any Kraton stock outside of a Rule 10b5-1 plan since 2012.[1]

43.     On October 30, 2017, Tremblay exercised 24,812 options to purchase Kraton stock and sold all 24,812 shares that same day for total proceeds of $1,186,510. The next day, on October 31, 2017, Tremblay exercised an additional 24,811 options to purchase Kraton stock and sold all 24,811 shares that same day for total proceeds of $1,196,635. These sales were not made pursuant to a Rule 10b5-1 plan. The options that Tremblay exercised became eligible to be exercised in installments beginning in June 2009 and ending in January 2015. These exercises and stock sales were highly unusual for Tremblay, who had not exercised any options since 2011 and had not sold any shares of Kraton stock since December 2012.

44.     On November 1, 2017, Fogarty exercised 81,430 options to purchase Kraton stock and sold all 81,430 shares that same day for total proceeds of $3,997,399. The options that Fogarty exercised became exerciseable in equal installments on each of the first three anniversaries of June 19, 2008. These stock sales were highly unusual for Fogarty, who had not sold any shares of Kraton stock outside of a Rule 10b5-1 plan since August 2010.

---

[1] Compared to the beneficial ownership disclosed in Kraton's 2017 Proxy materials, the Individual Defendants each sold more than 20% of the shares they beneficially owned.

45.     After realizing that his insider sales outside of a Rule 10b5-1 plan would look suspicious, and wanting to unload more of his Kraton stock before investors learned the truth about the failed Direct Connect implementation, Fogarty adopted a new Rule 10b5-1 plan on November 16, 2017 in a misguided attempt to create an affirmative defense for his insider sales. On December 18, 2017, Fogarty exercised 1,042 options to purchase Kraton stock and sold all 1,042 shares that same day for total proceeds of $52,100. Two weeks later, on January 2, 2018, Fogarty exercised an additional 87,768 options to purchase Kraton stock and sold all 87,768 shares that same day for total proceeds of $4,388,400. These trades were made pursuant to the Rule 10b5-1 plan that Fogarty adopted on November 16, 2017, while Fogarty was in possession of material non-public information about Kraton. The options that Fogarty exercised in these two transactions became exerciseable in equal installments on each of the first five anniversaries of January 3, 2010.

46.     Fogarty's December and January sales were highly unusual compared to Fogarty's past sales pursuant to Rule 10b5-1 plans. Fogarty's previous Rule 10b5-1 plan had been adopted on September 14, 2016. Under Fogarty's 2016 Rule 10b5-1 plan, Fogarty sold 36,012 shares of Kraton stock in November 2016 and an additional 27,968 shares in April 2017 for $2,063,671 in total proceeds. Prior to 2016, Fogarty had not sold any Kraton stock since December 2012.[2]

| Defendant | Date of Sale | Shares Sold | Acquisition Price | Sale Price | Proceeds | Profit |
|---|---|---|---|---|---|---|
| Tremblay | 10/30/2017 | 12,619 | $13.51 | $47.82 | $603,441 | $432,933 |
| Tremblay | 10/30/2017 | 12,193 | $14.46 | $47.82 | $583,069 | $406,758 |
| Tremblay | 10/31/2017 | 24,811 | $14.46 | $48.23 | $1,196,635 | $837,867 |
| Fogarty | 11/01/2017 | 81,430 | $13.51 | $49.09 | $3,997,399 | $2,897,117 |
| Fogarty | 12/18/2018 | 1,042 | $14.46 | $50.00 | $52,100 | $37,033 |
| Fogarty | 01/02/2018 | 87,768 | $14.46 | $50.00 | $4,388,400 | $3,119,275 |
| TOTAL | | 219,863 | | | $10,821,043 | $7,730,983 |

[2] On May 30, 2018, more than three months after this lawsuit had been filed, Fogarty exercised 2,709 options to purchase Kraton stock and sold all 2,709 shares that same day for total proceeds of $133,448.

47.     Tremblay's profit from these insider sales was $1,677,559. According to Kraton's 2018 Proxy Statement, Tremblay's total compensation in 2017 was $1,779,412. Tremblay's profit from these insider sales is equivalent to 94% of his total 2017 compensation.

48.     Fogarty's profit from these insider sales was $6,053,424. According to Kraton's 2018 Proxy Statement, Tremblay's total compensation in 2017 was $5,141,572. Tremblay's profit from these insider sales is equivalent to 118% of his total 2017 compensation.

49.     Kraton's Code of Ethics and Business Conduct prohibits its officers from selling a publicly-traded security while in possession of material, non-public information about the issuer of that security. This Code provides several examples of "material information," which include "earnings information" and "significant gains or losses of business."

### Materially False and Misleading Statements Issued During the Class Period

50.     On October 25, 2017, the Company held a conference call regarding its third quarter 2017 earnings. During the call, Defendants stated the Company was already producing Cariflex, a polyisoprene product, at its plant in Brazil, that it was transitioning customers to that new capability, and that the product was available for customers:

> **Fogarty:** With regard to the cost reset initiatives in our Polymer segment, ***we completed our Cariflex conversion in Paulinia, Brazil*** and our USBC expansion project in Berre, France remains on track.
>
> *     *     *
>
> **[Analyst:]** Can you elaborate on where you stand on the different pieces of your cost savings program including when you completed or expect to complete the construction of each of your global projects and also where capacity utilization is currently at each of the projects relative to where you expected to operate on a normalized environment?
>
> **Fogarty**: Steve, you want to jump in and take that one.

**Tremblay**: Jason, with the capital that we are deploying in Polenia which is what we refer to as our direct connect project which is to improve the overall capability of our Cariflex portfolio, that CapEx is deployed and ***we are currently in the process of continuing to transition customers to that new capability***.

*     *     *

**[Analyst:]** Okay. And just as a follow-up to that answer. It sounds like you're still in the very early stages of ramping up the projects that are completed. It sounds like Polenia and the JV and Taiwan is completed, but you're kind of in early stages of that. Is that correct?

**Fogarty:** I wouldn't say early stage necessarily. ***I mean early stage in terms of significant volumes, commercial volumes to customers. Yes. But the Cariflex opportunity in Polenia is much further along in the early stages where we got commercial product that's available for customers.*** Again, the CapEx is fully deployed.

(emphasis added).

51.     The statements referenced in ¶¶50-52 above (the "October Misstatements") were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, the October Misstatements were materially false or misleading because: (i) Fogarty stated that the Direct Connect conversion was "completed" without disclosing that the Company had not yet been able to produce commercially viable Cariflex through the new manufacturing process; (ii) Fogarty stated that the Company was "continuing to transition customers to that new capability" without disclosing that customers had already rejected the new product as defective; (iii) Fogarty stated that the Company had already produced "commercial product that's available to customers" without disclosing that certain customers had already rejected that product; and (iv) as a result, Defendants' statements about Kraton's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

52. The October Misstatements were material because (i) the Direct Connect problems resulted in a $7.6 million negative impact on the Company's fourth quarter 2017 Adjusted EBITDA, representing 9% of Kraton's adjusted EBITDA for the fourth quarter, including 15% of the adjusted EBITDA for the Company's polymer segment; and (ii) the Company's ability to produce Cariflex at the new Paulinia plant in a more cost-efficient manner was central to Kraton's future business plans. These incomplete statements misled investors into believing that the Direct Connect conversion had been a success and that the Company was producing commercial-quality Cariflex in a cost-efficient manner.

53. On November 28, 2017, the Company held an event, broadcast via webcast, at the Citi Basic Materials Conference. During the Event, Defendants again stated the Company was already producing Cariflex at its plant in Brazil, that it was transitioning customers to that new capability, and that the product was commercial grade:

> **James Peter Finnerty, Analyst**: Okay. And your Polymer segment, yet, I guess, three different projects going on. You have the Cariflex and conversion in Brazil. You had the HSBC facility in Taiwan and also the Berre, France expansion. Could you give us an idea of where each one of those stand?
>
> **Tremblay**: Yes, love to.
>
> **Finnerty**: And what -- how we should think about that in the next 12 months.
>
> **Tremblay**: Yes, those -- that's a nice summary of the $70 million. A lot of moving pieces, and again, *we've executed on that well. The team did a really good job*. This whole series of initiatives, if you try to pick what had to happen first, it was really, we make, in our Cariflex business, which is high-end surgical gloves and condoms, the business had -- nobody in our business competes -- no one in the industry competes against, it's roughly $180 million of revenue per year. When we invented that material, we made rubber out of Isoprene, literally made a solid block of rubber in Ohio, and moved it to our facility in Brazil, and then converted it to a latex, and then shipped that to Malaysia, where most of the gloves are made by glove dippers.
>
> And a pretty costly way to make the material, but it's the only way that we knew how to make it. And since we invented it, nobody else know how to make it either. So the team is working on a way to eliminate that step. We literally take perfectly

17

good isoprene, and convert it to a solid and then turn it into a liquid again. ***And we solved that and that was where the genesis of this conversion in our Brazil facility where we eliminated the step of making the precursor rubber in Ohio and shipping it to Brazil, and now we're able to make the latex from start to finish in Brazil and then ship the finished product directly to the customer.***

***That construction of that activity is completed, and we're going through the qualification stage with the customers.***

\*       \*       \*

**Finnerty**: And out of the three projects, which one has the most upside for the company going forward?

**Tremblay**: A different way you ask that question. That's -- I'm glad I let you finish. Well, I guess, where we're sitting right now, it's tough to say definitively, but I'd say it this way. ***The fact that we now have a new way to make latex to service that glove market***. And to the extent that we continue to see that business being a growth business for us perhaps, not the same levels as [has] been historical volume growth, but given how specialized that is and nobody else does it yet, that's on the top of the list of upside. The conversion in France, clearly great benefit in terms of overall setting our cost structure. I mean the cost structure there should be very close to our cost structure in Germany where we believe we're world class.

But if you just said future opportunity, ***I think cracking the code in Cariflex is a big deal***, and that's going to make further expansions more attractive from a capital perspective, to the extent we need more capacity, and we will at some point. And then ***it's hard to say that there's not a lot of upside in the new facility in France, given we just completed it, and we haven't sold any product material product to customers yet***.

54.    The statements referenced in ¶49 above (the "November Misstatements") were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Tremblay's statements that the Company "did a really good job," "cracked the code in Cariflex," "now [has] a new way to make latex," "solved that," and is "able to make the latex from start to finish in Brazil" failed to disclose that the Company had not yet been able to produce commercial quality Cariflex through the new manufacturing

process; (ii) Tremblay's statement that the Company was "going through the qualification stage with the customers" failed to disclose that customers had already rejected the new product as defective; and (iii) Tremblay's statement distinguishing the completion of the Direct Connect process in Brazil with the new facility in France by noting that the French facility had not yet sold any product to customers failed to disclose that a material number of Cariflex customers had already rejected that newly produced Cariflex. These incomplete statements misled investors into believing that the Direct Connect conversion had been a success and that the Company was producing commercial-quality Cariflex in a cost-efficient manner. The November Misstatements were particularly egregious given that they were made nearly two months into the fourth quarter of 2017, when the Company was fully aware of the scope of the problems with their Direct Connect manufacturing process.

55.     These misstatements and omissions were material because (i) the Direct Connect problems resulted in a $7.6 million negative impact on the Company's fourth quarter 2017 Adjusted EBITDA, representing 9% of Kraton's adjusted EBITDA for the fourth quarter and 15% of the adjusted EBITDA for the Company's polymer segment; and (ii) the Company's ability to produce Cariflex in a more cost-efficient manner was central to Kraton's future business plans, and Kraton was still uncertain whether its ongoing manufacturing changes would be able to solve the existing manufacturing problems.

**The Truth Emerges**

56.     On February 21, 2018, the Company filed an annual report on Form 10-K for the fiscal year ended December 31, 2017 (the "2017 10-K") with the SEC, which provided the Company's annual financial results and position.

57.     The 2017 10-K reported that certain customers were dissatisfied with the quality of its Brazilian-produced Cariflex during the fourth quarter, which Kraton attributed to flaws in its manufacturing process, and that this negatively impacted earnings, stating in relevant part:

> *In the third quarter 2017, we initiated a new manufacturing process for our Cariflex product at our manufacturing facility in Paulinia, Brazil. Although material produced using this new process met technical specifications, during the fourth quarter 2017, some customers notified us that they were experiencing processing issues with the material. While the majority of material shipped in the fourth quarter is being used, the degree of issues noted by our customers varied, and in certain cases the material was returned to us for evaluation. We have implemented a number of manufacturing changes in an effort to address these issues going forward and these changes appear to be lessening the processing issues.* The negative financial impact to our fourth quarter 2017 operating income including our Adjusted EBITDA was $7.6 million. See *Item 6. Selected Financial Data* for a reconciliation of U.S. GAAP operating income to Adjusted EBITDA (non-GAAP).

(emphasis added).

58.     On February 18, 2018, the Company hosted a Fourth Quarter 2017 Earnings Call. On that call, Fogarty stated:

> I'll also point out the Polymer segment posted these strong results despite a $7.6 million fourth quarter negative impact associated with processing issues some of our customers experienced with the direct-connect Cariflex material produced in Paulínia, Brazil. Although the material produced in Brazil met defined specifications, we were advised of processing issues by certain of our customers in the fourth quarter. In response, we have made a number of manufacturing stabilization changes that we believe will address these issues, and we're, of course, fully committed to continue to work with our customers to resolve the processing issues.

***

> Our adjusted and GAAP EPS excludes the $0.24 per share charge associated with the Cariflex issues in Brazil.

59.     On that same call, in response to a question about what went wrong with the Direct Connect implementation, Fogarty disclosed that Defendants knew of the risk that the Direct Connect process would produce faulty Cariflex:

20

**C**hristopher **John Kapsch, Loop Capital Markets LLC, Research Division**: I had a question about the Cariflex issue. I just want to make sure I understand. The -- you -- in your formal comments you mentioned that the product met technical specs, but some customers are having the processing issue. So I'm just wondering to appease them, did you have to provide them some of the legacy product? Or were you able to identify what other characteristics of the new product might be causing the process issues despite being in spec? And when do you think you'll have confidence that in fact, this new production process will, in fact, be copacetic with these key customers?

**Fogarty**: Chris, it's Kevin. First of all, couple of questions here. The first one is as you recall, our supply chain is set up such that we produce material with the new technology in Brazil as well as we produce material through our supplier relationship in Japan with a third party that we've been in business with for quite some time. And I guess, to use your words, that third party does use and continues to use the existing technology or their conventional technology. So we have that kind of supply chain flexibility, obviously, during this period to ensure that from a customer perspective, they continue to see volume they need. ***That all being said, with respect to the actual issues down in Brazil, we -- of course, we recognize that this was a startup of a new technology, and <u>we're not entirely surprised that there are some issues associated with that type of new material that the customers experienced</u>***, clearly disappointed. But the good news is, once again, Kraton has expertise in this field that we believe is second to none and it was all hands on deck to make sure that we address some of the issues as we saw in our production facility through our stabilization efforts, and our customers continue to work very diligently with us because they want to see this new technology just be successful as we do, because they know that is going to be the supply source of the future for their growth. And we're pleased with direction that we've taken, and we're pleased with the progress we've made so far. I think we'll be in a pretty good position by the time we get to the next earnings call, shall we say, in what's that, Steven, about 6 weeks? And we continue to make progress every day that we'll be able to give you a more fulsome update.

(emphasis added)

60.     Despite knowing the risk that the Direct Connect process would produce faulty material that its customers could not process, Defendants never warned investors of this risk. Instead, Defendants misled investors to believe the manufacturing process in its Paulinia plant was producing high-quality finished product – that they had "cracked the code" and no manufacturing problems existed.

61.     On this news, the Company's shares fell $7.69 per share or over 15% to close at $43.10 per share on February 21, 2018, damaging investors.

62.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities Plaintiff and other Class members have suffered significant losses and damages.

## Additional Scienter Allegations

63.     Tremblay's and Fogarty's extremely detailed statements about the purpose, mechanics, implementation, and progress of the Direct Connect manufacturing changes in Brazil – before, during, and after the Class Period – demonstrate that they each had intimate knowledge of manufacturing flaws and customer complaints that occurred during the fourth quarter of 2017.

64.     The Individual Defendants' insider sales of Kraton stock at artificially-inflated prices while in the possession of material non-public information about Kraton's earnings and manufacturing capabilities demonstrate that each had a strong personal pecuniary motive to mislead investors. The October and November Misstatements made investors believe that Kraton had "cracked the code" with Cariflex, artificially inflating the price so that the Individual Defendants could extract over $7.7 million in profits – more than their combined total compensation for the whole year – before finally disclosing the truth to investors in February 2018. Fogarty's adoption of a Rule 10b5-1 trading plan in November 2017, while already in possession of material non-public information, was a misguided attempt to create an affirmative defense for his insider trading that further demonstrates his scienter.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

65.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise

acquired Kraton securities publically traded on NYSE during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

66.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Kraton securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Kraton or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

67.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

68.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

69.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.  whether the federal securities laws were violated by Defendants' acts as alleged herein;

b.  whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Kraton;

c.  whether the Individual Defendants caused Kraton to issue false and misleading financial statements during the Class Period;

d.  whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

e.  whether the prices of Kraton securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

f.  whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

70.  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

71.  Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a.  Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b.  the omissions and misrepresentations were material;

c.      Kraton securities are traded in an efficient market;

d.      the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

e.      the Company traded on the NYSE and was covered by multiple analysts;

f.      the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

g.      Plaintiff and members of the Class purchased, acquired and/or sold Kraton securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

72.      Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

73.      Plaintiff and the members of the Class are also entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## <u>COUNT I</u>

### **Violations of Section 10(b) of the Exchange Act and Rule 10b-5**
### <u>**Against All Defendants**</u>

74.      Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

75.      This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

76.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Kraton securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Kraton securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

77.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Kraton securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Kraton's finances and business prospects.

78.     By virtue of their positions at Kraton, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose

such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

79.     Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of Kraton securities from their personal portfolios.

80.     Kraton showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Kraton, the Individual Defendants had knowledge of the details of Kraton's internal affairs.

81.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Kraton. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Kraton's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Kraton securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Kraton's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Kraton securities at

artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

82.     During the Class Period, Kraton securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Kraton securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Kraton securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Kraton securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

83.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

84.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

**COUNT II**
**Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

85.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

86.     During the Class Period, the Individual Defendants participated in the operation and management of Kraton, and conducted and participated, directly and indirectly, in the conduct of Kraton's business affairs. Because of their senior positions, they knew the adverse non-public information about Kraton's current financial position and future business prospects.

87.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Kraton's business practices, and to correct promptly any public statements issued by Kraton which had become materially false or misleading.

88.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Kraton disseminated in the marketplace during the Class Period concerning the Company's business, operational and accounting policies. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Kraton to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Kraton within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Kraton securities.

89.     Each of the Individual Defendants, therefore, acted as a controlling person of Kraton. By reason of their senior management positions and/or being directors of Kraton, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Kraton to engage in the unlawful acts and conduct complained of herein. Each of the Individual

Defendants exercised control over the general operations of Kraton and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

90.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Kraton.

## COUNT III

### Violations of Section 20A of the Exchange Act
### Against the Individual Defendants

91.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

92.     Count III is brought pursuant to §20A of the Exchange Act against the Individual Defendants, on behalf of Plaintiffs who were damaged by the Individual Defendants' insider trading.

93.     As detailed herein, the Individual Defendants were in possession of material, non-public information concerning Kraton. The Individual Defendants took advantage of their possession of material, non-public information regarding Kraton to obtain millions of dollars in insider trading profits during the Class Period.

94.     The Individual Defendants' sales of Kraton common stock were made contemporaneously with Plaintiff's purchase of Kraton common stock during the Class Period.

95.     For example, Fogarty sold 87,768 shares of Kraton common stock on January 2 at $50.00 per share, and Plaintiff purchased 1,000 shares of Kraton common stock on January 9 at $52.81 per share.

96.     Plaintiffs who purchased shares of Kraton common stock contemporaneously with sales by the Individual Defendants' suffered damages because: (1) in reliance on the integrity of

30

the market, they paid artificially inflated prices as a result of the violations of §§10(b) and 20(a) of the Exchange Act as alleged herein; and (2) they would not have purchased the securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by the false and misleading statements and concealment alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as her reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: August 27, 2018

Respectfully submitted,

**STECKLER GRESHAM COCHRAN PLLC**

<u>/s/ R. Dean Gresham</u>
R. Dean Gresham
Texas Bar No. 24027215
12720 Hillcrest Rd, Suite 1045
Dallas, Texas 75230
Telephone: (972) 387-4040
Facsimile: (972) 387-4041
Email: dean@stecklerlaw.com

-and-

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq. (not admitted)
Laurence M. Rosen, Esq. (not admitted)
275 Madison Avenue, 34th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
        lrosen@rosenlegal.com
Counsel for Plaintiff